1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8
9

| | |
|---|---|
| CHRIS CARLSON, | CASE NO. C20-1150 MJP |
| Plaintiff, | ORDER ON CROSS-MOTIONS RE: CLASS CERTIFICATION |
| v. | |
| HOME DEPOT USA INC, THE HOME DEPOT INC, | |
| Defendants. | |

This matter comes before the Court on Plaintiff's Motion for Class Certification (Dkt. No. 62 and 89) and Defendants' Motion to Deny Class Certification (Dkt. No. 21). Having reviewed the Motions, Oppositions (Dkt. Nos. 96, 99), and all supporting materials, and having held oral argument on September 30, 2021, the Court GRANTS in part Plaintiff's Motion and DENIES in part Defendants' Motion.

1          **BACKGROUND**

2          Chris Carlson claims his former employer, Home Depot U.S.A., Inc. and The Home

3   Depot, Inc. (Home Depot), failed to provide him with timely and full rest and meal breaks due to

4   Home Depot's company-wide policies, culture, and practices. Carlson brings four claims against

5   Home Depot for: (1) failure to provide timely and full meal breaks as required by Washington

6   law; (2) failure to provide timely and full rest breaks as required by Washington law; (3) willful

7   withholding of wages in violation of the Wage Rebate Act; and (4) violating the Consumer

8   Protection Act by manipulating time punch records. Carlson seeks certification of a class

9   containing "[a]ll individuals employed by Home Depot as in-store supervisors or specialists in

10  Washington state at any time between June 26, 2017 and the date of the Order granting class

11  certification in this matter." (Pl. Mot. for Class Cert. at 2 (Dkt. No. 89).)

12          To understand the merits of the cross-motions on class certification, the Court reviews the

13  job duties of Home Depot supervisors and specialists, Home Depot's relevant policies and

14  practices, and time punch data for the proposed class.

15  **A.   Supervisors and Specialists**

16          Carlson was an in-store supervisor in Home Depot's Federal Way store for many years.

17  (Complaint ¶¶ 1.1, 3.6 (Dkt. No. 1-1).) "Supervisors oversee the work of teams of associates and

18  specialists in a store's various departments, such as hardware and tools, garden, plumbing, etc.

19  Specialists work in departments that require specialized knowledge and experience, helping

20  customers design, plan, and purchase supplies for more complicated projects such as kitchen

21  improvements, decks, doors and windows, etc." (Id. ¶ 4.3.) As a supervisor, Carlson alleges he

22  "was frequently required to perform the same work as the specialists and was subject to the same

23  obstacles getting rest breaks and meal periods as described for specialists." (Id. at 4.5.)

24

1    "Supervisors and specialists are paid on an hourly basis and are non-exempt employees under the

2    MWA [Minimum Wage Act, (RCW 49.46)]." (Id. ¶ 4.4.)

3    **B.      Home Depot's Policies, Customs, and Practices**

4            Carlson alleges that "Home Depot has a pattern and practice of failing to ensure that

5    supervisors and specialists are provided legally compliant rest breaks and meal periods." (Compl.

6    ¶ 4.6.) He alleges that "supervisors often miss their rest breaks and meal periods, cut their rest

7    breaks and meal periods short, or are forced to take their meal periods after working more than

8    five hours straight because their teams are short-staffed, they need to cover for team members

9    who are taking breaks, they are engaged in special projects, or they are needed to help customers

10   and cannot leave to take a break." (Id. ¶ 4.6.) Carlson supports these allegations with his own

11   testimony and the declarations of 19 other supervisors and specialists. (See Dkt. Nos. 69-87.)

12   Carlson also alleges that supervisors and specialists frequently miss second meal breaks when

13   they work 10 or more hours, a fact supported by several declarants. (Compl. ¶ 4.8; Lusebrink

14   Decl. ¶ 5 (Dkt. No. 81); Mccarty Decl. ¶ 5 (Dkt. No. 83), Cronin Decl. ¶ 6 (Dkt. No. 75); M.

15   Davis Decl. ¶ 4 (Dkt. No. 77); Bell Decl. ¶ 4 (Dkt. No. 69); Christian Decl. ¶ 5 (Dkt. No. 73);

16   Reynolds Decl. ¶ 5 (Dkt. No. 70); Carter Decl. ¶ 4 (Dkt. No. 72); and Craig Decl. ¶ 4 (Dkt. No.

17   74).) Through limited discovery, Carlson identifies three reasons why supervisors and specialists

18   do not receive adequate breaks and are not paid for late or missed breaks.

19           First, Carlson asserts that two of Home Depot's policies prevent supervisors and

20   specialists from taking timely and full breaks: (1) Home Depot's customer-first policy; and (2)

21   Home Depot's attendance policy.

22           According to Carlson, Home Depot's customer-first policy impedes supervisors and

23   specialists from taking full and timely breaks because they face discipline if they fail to put

24

1   customers first. Home Depot's Code of Conduct states that "Customer Service is the number one

2   priority for all associates." (Declaration of Adam Berger Ex. 1 at 2.) An employee commits a

3   "Minor Work Rule Violation" if they disregard a customer's needs, which includes "not

4   stay[ing] with customer until [the] question is answered, issue is resolved or customer is

5   satisfied" (Id. at 12; see also Deposition of Chris Carlson at 12:25-13:6, 16:10-21.) Similarly,

6   Home Depot's Standards of Performance make it a "minor violation" not to "follow or

7   demonstrate [customer] FIRST behaviors," including "failing to answer a customer's questions

8   or help to address the customer's needs." (Berger Decl. Ex. 2 at 1-2.) Under the Code of Conduct

9   a Minor Work Rule Violation "would normally result in discipline and may individually or

10  cumulatively result in termination of employment depending on the seriousness of the offense."

11  (Berger Decl. Ex. 1 at 12.) And an employee commits a "Major Work Rule Violation" by

12  "intentional[ly] refus[ing] to help a customer," which "will normally result in termination of

13  employment for a first offense." (Id. at 6; Berger Decl. Ex. 2 at 2 (same).) And, more generally,

14  "[a]ny associate who violates a rule of conduct may be disciplined up to and including

15  termination of employment." (Berger Decl. Ex. 1 at 2.) As Carlson and other specialists and

16  supervisors suggest, supervisors and specialists are frequently unable to take breaks in the middle

17  of helping customers, while customers are waiting, or when their department would be left

18  unattended in their absence. (See Dkt. Nos. 69-87; Carlson Dep. at 12-22, 37-38.) Curiously,

19  Home Depot's counsel suggested at oral argument that these rules are merely "aspirational" and

20  subject to employees' "idiosyncratic" understanding, and that discipline is rarely meted out.

21  Counsel provided no citation to support these statements and the Court is aware of nothing in the

22  record that would.

23

24

Carlson also argues that Home Depot's meal and rest break policies do little to help supervisors and specialists take breaks and instead put pressure on them not to report missed or late breaks. Under Home Depot's Code of Conduct, associates must "follow the work schedule and take meal periods when they are scheduled." (Berger Decl. Ex. 1 at 3.) Having "excessive missed punches" or "recurrent, missed meal periods, short meal periods or meal periods at times other than the scheduled times" are considered a "Minor Work Rule Violation" that can potentially lead to termination. (Berger Decl. Ex. 1 at 13.) The Guidelines for Attendance and Punctuality also require employees to take meal breaks and punch out for them. (Berger Decl. Ex. 6 at 2.) Failure to do so will result in an occurrence, which are tracked by management through a "variance" report and violations of the guidelines "may lead to discipline, up to and including termination of employment from the Company." (Id. at 1.) Carlson argues that these policies put supervisors and specialists in a Catch-22—they are forced to choose between violating Home Depot's customer-first policies by taking breaks while customers wait or violating Home Depot's break-related guidelines and policies by missing breaks to help customers. This dilemma is evident in the declarations submitted by both Home Depot and Carlson. Home Depot has submitted 57 declarations from current employees, many of whom claim that they delayed meal breaks to help customers. (See Def. Mot. at 7 n.21; Def. Opp. to Pl Mot. at 6 n.4.) And Carlson's cohort of declarants similarly state that they were frequently unable to take rest breaks because they had to help customers. (See Dkt. Nos. 69-87.) And Carlson himself was "counseled" for missed, late, or shortened meal breaks. (See Berger Decl. Ex. 7.)

At oral argument, counsel for Home Depot suggested that Carlson incorrectly weaves together Home Depot's Code of Conduct, Standards of Performance, and Guidelines for

1    Attendance and Punctuality into a "tapestry" when they should instead be considered in isolation.

2    The express language of the policies contradicts this assertion. The Guidelines for Attendance

3    and Punctuality expressly state that they should be "utilized in conjunction with our Code of

4    Conduct and Discipline Process," and the Code of Conduct makes a similar reference to the

5    Attendance Guidelines. (Berger Decl. Ex. 6 at 1; Id. Ex. 1 at 3.) And the Standards of

6    Performance state that "Associates must adhere to and fully comply with the Standards of

7    Performance . . . [and] other written instructions or guidelines . . . including anything not

8    specifically referenced in the Standards of Performance." (Berger Decl. Ex. 2 at 2.) Even if this

9    weaving together of policies and guidelines was not express, common sense betrays counsel's

10   suggestion that a Home Depot employee could simply ignore the policies or procedures without

11   consequences. Carlson himself was subject to discipline for not taking timely and full meal

12   breaks. (See Berger Decl. Ex. 7.)

13         Second, the unique role that specialists and supervisors play further complicates their

14   ability to take timely breaks because they must spend substantial time assisting a single customer

15   design a project or complete an order. (See Carlson Dep. 18.) It is difficult for these employees

16   to disengage from customers and take breaks. And given their specialized knowledge,

17   supervisors and specialists are frequently unable to find others to relieve them to help a

18   customer. (See id. at 16-18; A. Davis Decl. ¶¶ 3-4 (Dkt. No. 76); M. Davis Decl. ¶¶ 3, 5; Bell

19   Decl. ¶¶ 3, 5; Bertch Decl. ¶¶ 3-4 (Dkt. No. 71); Christian Decl. ¶¶ 3-6; Cronin Decl. ¶¶ 3, 5;

20   Greenfield Decl. ¶ 3 (Dkt. No. 78); Lusebrink Decl. ¶¶ 3-4; Martin Decl. ¶ 3 (Dkt. No. 82);

21   Repyak Decl. ¶¶ 3, 5 (Dkt. No. 70); Reynolds Decl. ¶¶ 3-4; Sanchez Decl. ¶¶ 3-6 (Dkt. No. 86).)

22   While a supervisor or specialist assists a single customer, other customers "stack up" behind and

23   wait for service, further preventing timely breaks. (See Carlson Dep. at 18, 20.) Members of the

24

1   class also aver that they frequently could not find relief from colleagues to take breaks and/or

2   were called back from breaks early to the floor to assist with customer demands. (Price Decl. ¶¶

3   3-4 (Dkt. No. 84); Lusebrink Decl. ¶¶ 3-6; Sanchez Decl. ¶¶ 3-5; Repyak Decl. ¶¶ 3-6; Fabiano

4   Decl. ¶¶ 3-4 (Dkt. No. 79); Bertch Decl. ¶ 3; Bell Decl. ¶¶ 3-5; Christian Decl. ¶¶ 3-6; A. Davis

5   Decl. ¶¶ 3-4; Reynolds Decl. ¶¶ 3-7; and Greenfield Decl. ¶¶ 3-4.)

6        Third, Carlson cites the low staffing levels at Home Depot stores as another reason he

7   could not take timely meal and rest breaks. Eight of the declarants in the proposed class describe

8   low staffing levels as a reason they could not take breaks. (See Lusebrink Decl. ¶ 5; McCarty

9   Decl. ¶ 5; Cronin Decl. ¶ 6; M. Davis Decl. ¶ 4; Bell Decl. ¶ 4; Christian Decl. ¶ 5; Reynolds

10   Decl. ¶ 5; Carter Decl. ¶ 4 (Dkt. No. 72); and Craig Decl. ¶ 4). According to Carlson, store

11   managers are financially incentivized to leanly staff each store. (See Berger Decl. Ex. 4.)

12   **C.     Time Records for the Class**

13        Carlson supports his allegations about missed and delayed meal breaks with time punch

14   data from Home Depot's time tracking system, Kronos. Carlson's expert, Paul Torelli, Ph.D.,

15   reviewed the time punch records for the 2,478 putative class members and found that 5% missed

16   their first meal break, 51.9% missed their second meal break (due after 10 hours of work), 23.9%

17   had late meal periods, and 1.5% had early meal periods. (Declaration of Paul Torelli ¶ 5.) In

18   total, nearly 32% of the meal breaks were missed, late, or early. (Id.) The data were relatively

19   consistent between stores, with a bell-curved statistical distribution minus a few outlier data

20   points. (Id. ¶ 6.) Dr. Torelli's analysis did not report on whether the data were manipulated or

21   edited. And the time records do not track rest breaks.

22        Carlson also notes that the Kronos system does not allow employees to identify missed or

23   late breaks and it does not track rest breaks at all. Nor does Home Depot track any instance

24

1    where an employee expressly waives a meal break. But Home Depot's managers use the Kronos

2    system to track missed or late meals through a "variance report" and then "counsel" employees

3    to take timely meal breaks. (See Carlson Decl. ¶ 3; Carlson Dep. at 109-110 (Dkt. No. 97).)

4    Indeed, Carlson himself was "counseled" several times for missed, late, or shortened meal

5    breaks. (Berger Decl. Ex. 7.) Counseling is part of the discipline process that can lead to

6    termination. (Berger Decl. Ex. 1 at 14.)

7          Carlson alleges that as a result of the meal break policy he and others were routinely

8    pressured to alter their time punch records to show meal breaks when none were actually taken.

9    (Compl. ¶ 4.11.) Carlson refers to this as a "paper lunch"—a meal break that exists on paper

10   only. (Carlson Dep. at 70-71.) Carlson testified that he was asked by managers to alter his time

11   record to show paper lunches. (Carlson Dep. at 141.) Give other potential class members attest to

12   the same pressure. (Mccarty Decl. ¶ 7; Martin Decl. ¶ 4; Cronin Decl. ¶ 4; Christian Decl. ¶ 8;

13   and Reynolds Decl. ¶ 4.)

14                                          **ANALYSIS**

15   **A.      Plaintiff's Claims and the Relevant Law**

16         To resolve the cross-motions, the Court must analyze the elements and requirements of

17   Carlson's substantive claims. First, the Court looks at Washington's laws concerning rest and

18   meal breaks, which are found in Washington's Industrial Welfare Act (IWA) (RCW 49.12),

19   Minimum Wage Act (MWA) (RCW 49.46), and the Department of Labor and Industries' (LNI)

20   implementing regulations, WAC 296-126-092. Second, the Court examines the contours of the

21   Wage Rebate Act, RCW 49.52. Third, the Court sets out the elements of Carlson's Consumer

22   Protection Act claim.

23

24

1            1.       **IWA, MWA, and LNI Regulations**

2        The IWA and MWA are remedial statutes that protect "employees' safety, health, and

3    welfare" by ensuring timely breaks are provided to employees and that they are paid overtime for

4    each missed break. See Wingert v. Yellow Freight Sys., Inc., 146 Wn.2d 841, 847, 852 (2002);

5    Washington State Nurses Ass'n v. Sacred Heart Med. Ctr., 175 Wn.2d 822, 832 (2012); Lopez

6    Demetrio v. Sakuma Bros. Farms, 183 Wn.2d 649, 658 (2015). Remedial statutes protecting

7    employee rights must be liberally construed. See Internat'l Ass'n of Fire Fighters, Local 46 v.

8    City of Everett, 146 Wn.2d 29, 35 (2002).

9        LNI's regulations implementing the IWA require employers to provide a meal period of

10   at least 30 minutes for every five hours worked, which must be taken no early that 2 hours and

11   no more than 5 hours from the beginning of a shift. See WAC 296-126-092(1)-(2). Employees

12   working ten or more hours are entitled to a second meal break of no less than 30 minutes. See

13   WAC 296-126-092(3). LNI regulations also require that employees be given a paid 10-minute

14   rest break for every four hours worked. WAC 296-126-092(4). And no employee shall be

15   required to work more than three hours without a rest break. Id.

16       LNI regulations "'impose[] a mandatory obligation on the employer' to provide a paid

17   rest break 'on the employer's time.'" Lopez Demetrio, 183 Wn.2d at 658 (quoting Pellino v.

18   Brink's Inc., 164 Wn. App. 668, 688 (2011) (citation omitted)). "It is not enough for an employer

19   to simply schedule time throughout the day during which an employee can take a break if he or

20   she chooses." Id. "Instead, employers must affirmatively promote meaningful break time." Id.

21   "A workplace culture that encourages employees to skip breaks violates WAC 296–126–092

22   because it deprives employees of the benefit of a rest break 'on the employer's time.'" Id.

23   (quoting WAC 296-126-093). "WAC 296-126-092 imposes a mandatory obligation on the

24

1   employer to provide meal breaks and to ensure those breaks comply with the requirements of

2   WAC 296-126-092." Brady v. Autozone Stores, Inc., 188 Wn.2d 576, 584 (2017). And the

3   Supreme Court has suggested that the employer must "maintain[] an adequate system for

4   ensuring that [employees] could take breaks and record missed breaks." Chavez v. Our Lady of

5   Lourdes Hosp. at Pasco, 190 Wn.2d 507, 518–19 (2018). And while LNI established different

6   rules for meal and rest breaks, courts make no formal distinction between the two when

7   considering the employer's obligations. See Pellino, 164 Wn. App. at 690; (Def. Mot. to Deny

8   Class Cert. at 15 (same)).

9        "[A]n employee asserting a meal break violation under WAC 296-126-092 can meet his

10   or her prima facie case by providing evidence that he or she did not receive a timely meal break."

11   Brady, 188 Wn.2d at 583 (2017). "The employer may then rebut this by showing that in fact no

12   violation occurred or a valid waiver exists." Id. (citing Pellino, 164 Wn. App. at 696-97 (waiver

13   is an "affirmative defense" on which employer bears the burden of proof)). But rest breaks

14   cannot be waived under Washington law. See Washington Department of Labor and Industries

15   Administrative Policy ES.C.6.1, "Meal and Rest Periods for Nonagricultural Workers Age 18

16   and Over," at 4 (rev. Dec. 1, 2017) ("Employees may not waive their right to a rest period.")

17   (Berger Dec. Ex. 9).

18        In arguing about the status of Washington's labor laws, Home Depot relies on two cases

19   the Court declines to follow. First, Home Depot relies a 2006 decision which concluded that

20   "there is no affirmative duty either for the employer to schedule a meal period, or for the

21   employee to take a lunch break." Eisenhauer v. Rite Aid Hdqtrs., No. C04-5783RBL, 2006 WL

22   1375064, at *2 (W.D. Wash. May 18, 2006). This decision cannot be squared with intervening

23   authority, which broadly holds that an employer must "affirmatively promote meaningful"

24

1    breaks, Lopez Demetrio, 183 Wn.2d at 658, and "ensure those breaks comply with the

2    requirements of WAC 296-126-092," Brady, 188 Wn.2d at 584. Second, Home Depot relies on

3    an unpublished state appellate decision to suggest that employers only have to "allow" meal

4    breaks. See Brown v. Golden State Food Corp., 186 Wn. App. 1004, 2015 WL 786804, at *9–10

5    (2015) (unpublished). But as Carlson correctly notes, the majority decision in Brown cannot be

6    squared with the Supreme Court's holding in Brady or Lopez Demetrio. Indeed, the dissent in

7    Brown correctly aligns with the current state of the law. The Court rejects any reliance on

8    Eisenhauer or Brown.

9        Home Depot also misplaces reliance on decisions considering and applying California's

10   rest and meal break laws. The Washington Supreme Court has expressly rejected following the

11   California Supreme Court's interpretation of these law, which provide for less stringent

12   protections for meal and rest breaks than Washington's. See Brady, 188 Wn.2d at 583 (citing

13   Brinker Restaurant Corp. v. Superior Court, 53 Cal.4th 1004, 273 P.3d 513, 139 Cal.Rptr.3d 315

14   (2012)  and noting that "[a]s between Pellino [applying Washington law] and Brinker [applying

15   California law], we find that the Washington case provides the better approach"). The Court

16   therefore focuses its analysis on Washington law as to the substance of Carlson's meal and rest

17   break claims.

18       **2.    Wage Rebate Act**

19       Under the Wage Rebate Act an employer who violates the IWA or MWA may be liable

20   for double damages if it willfully witholds wages. See Wingert, 146 Wn.2d at 849-50; Hill v.

21   Garda CL Nw., Inc., 191 Wn.2d 553, 561 (2018). "The standard for proving willfulness is low—

22   our cases hold that an employer's failure to pay will be deemed willful unless it was a result of

23   careless[ness] or err[or]." Hill, 191 Wn.2d at 561 (citation and quotation omitted). "But an

24

1    employer defeats a showing of willful deprivation of wages if it shows there was a 'bona fide'

2    dispute about whether all or part of the wages were really due." Id. (citation omitted).

3    **3.    Consumer Protection Act**

4        The CPA prohibits unfair and deceptive acts or practices in trade and commerce and

5    awards treble damages to individuals whose property or business is harmed by such acts. RCW

6    19.86.020 and .090. "The elements of a private CPA claim are: (1) an unfair or deceptive act or

7    practice; (2) which occurs in trade or commerce; (3) that impacts the public interest; (4) which

8    causes injury to the plaintiff in his or her business or property; and (5) which injury is causally

9    linked to the unfair or deceptive act." Washington State Physicians Ins. Exch. & Ass'n v. Fisons

10   Corp., 122 Wn.2d 299, 312 (1993).

11       The CPA is a remedial statute that defines "injury" liberally to include when "the

12   plaintiff's property interest or money is diminished . . . even if the expenses caused by the

13   statutory violation are minimal." Panag v. Farmers Ins. Co. of Wash., 166 Wn.2d 27, 57 (2009)

14   (en banc) (quotations omitted). The CPA may extend to conduct occurring within an

15   employment relationship. See Torres v. Mercer Canyons Inc., 835 F.3d 1125, 1140 (9th Cir.

16   2016).

17   **B.    Class Certification Standard**

18       Courts must undertake a "rigorous analysis" of all the Rule 23 factors to determine

19   whether to certify a class. Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 351 (2011). The

20   plaintiff must first meet all four requirements in Rule 23(a): numerosity, commonality, typicality,

21   and adequacy of representation. See Leyva v. Medline Indus., 716 F.3d 510, 512 (9th Cir. 2013);

22   Fed. R. Civ. P. 23(a). The plaintiff must also satisfy one of the Rule 23(b) factors. Carlson seeks

23   certification under the "predominance" standard of Rule 23(b)(3). "To obtain certification of a

24

class action for money damages under Rule 23(b)(3)," Carlson must also establish that "the questions of law or fact common to class members predominate over any questions affecting only individual members." Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 460.

Carlson must demonstrate predominance and superiority under Rule 23(b)(3) by a preponderance of the evidence fits Rule 23(b)(3). See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC, 993 F.3d 774, 784 (9th Cir. 2021). "Establishing predominance, therefore, goes beyond determining whether the evidence would be admissible in an individual action" and "[i]nstead, a 'rigorous analysis' of predominance requires 'judging the persuasiveness of the evidence presented' for and against certification.'" Id. at 785-86 (quoting Ellis v. Costco Wholesale Corp., 657 F.3d 970, 982 (9th Cir. 2011)). And in ruling on a motion for class certification "[c]ourts must resolve all factual and legal disputes relevant to class certification, even if doing so overlaps with the merits." Id. at 784 (citing Wal-Mart, 564 U.S. at 351).

The Parties dispute only predominance, commonality, and superiority—Home Depot makes no challenge to numerosity, typicality or adequacy. But to properly exercise its discretion under Rule 23, the Court reviews all of the factors for class certification.

### 1.    Commonality and Predominance

Because commonality and predominance overlap, the Court considers these elements together. See, e.g., Valentino v. Carter–Wallace, Inc., 97 F.3d 1227, 1234 (9th Cir. 1996) ("Implicit in the satisfaction of the predominance test is the notion that the adjudication of common issues will help achieve judicial economy.").

#### a.    Legal Standard

"Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury." Wal-Mart, 564 U.S. at 349–50 (citation and quotation omitted). To satisfy

commonality, the claims must depend on a common contention "that is capable of classwide resolution." <u>Id.</u> at 350. "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." <u>Id.</u> (quotation and citation omitted). "Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." <u>Id.</u> (quotation and citation omitted).

The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." <u>Amchem Products, Inc. v. Windsor</u>, 521 U.S. 591, 623 (1997). "This calls upon courts to give careful scrutiny to the relation between common and individual questions in a case." <u>Tyson Foods, Inc. v. Bouaphakeo</u>, 577 U.S. 442, 453 (2016). "An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." <u>Id.</u> (citation and quotation omitted). "The Rule 23(b)(3) predominance inquiry asks the court to make a global determination of whether common questions prevail over individualized ones." <u>Torres</u>, 835 F.3d at 1134. "Considering whether questions of law or fact common to class members predominate begins, of course, with the elements of the underlying cause of action." <u>Erica P. John Fund, Inc. v. Halliburton Co.</u>, 563 U.S. 804, 809 (2011) (internal quotation marks omitted).

### b.    Common Questions

Carlson identifies three questions common to his claims that can be resolved on a classwide basis using generalized, classwide proof. The questions are whether:

> Home Depot's policies and practices, including its staffing practices, "Customers First" policy, disciplinary practices related to late and missed breaks, Manager Incentive Program, and failure to institute a system to report missed breaks, create a workplace

environment that discourages class members from taking timely, full rest and meal breaks;

Home Depot's policies and practices result in a widespread pattern of late, missed, or interrupted rest and meal breaks; and

Home Depot has violated Washington law by failing to provide additional compensation for missed or late rest and meal breaks, including, but not limited to, those missed and late meal breaks reported in its timekeeping system.

(Pl. Mot. at 14-15.) The Court considers these questions in the context of the specific claims made, which helps resolve whether class certification is appropriate here.

### c.   Meal Break Claims

Carlson has identified common questions concerning his missed and delayed meal break claims that are capable of class-wide resolution and that predominate.

To prove his meal break claims, Carlson's prima facie burden is to show that "he or she did not receive a timely meal break." Brady, 188 Wn.2d at 583. Carlson points to three categories of evidence common to the class that meet his prima facie burden.

First, Carlson points to common policies, customs, and practices that prevent specialists and supervisors from enjoying timely and full meal breaks: Home Depot's customer-first policy, the lean store staffing, and the unique role of specialists and supervisors. Carlson backs this up with his own testimony and the statements of 19 class members. These declarations showcase Home Depot's failure to enable timely and full meal breaks. Second, Carlson cites to time-punch data for the proposed class, which show 5% missed first meal breaks, 51.9% missed second meal breaks, 23.9% took late meal breaks, and 1.5% had early meal periods. (Torelli Decl. ¶ 5.) The data are compelling particularly when coupled with the class-wide custom and practice evidence. Third, Carlson has shown that Home Depot provide no means for employees to record missed or late meal or rest breaks. This further buttresses Carlson's claimed violation of the LNI regulations. See Chavez, 190 Wn.2d at 518–19 (noting that the failure to provide a means of

1   recording missed breaks supports a claim violation of the regulations). Together, this class-wide

2   evidence can resolve the key common questions Carlson poses, which support his prima facie

3   claim. This satisfies both commonality and predominance. See Wal-Mart, 564 U.S. at 350;

4   Bouaphakeo, 577 U.S. at 453.

5        Relying heavily on two cases from this District, Home Depot argues that the evidence

6   Carlson presents is inadequate to show predominance. The Court is unpersuaded. First, Home

7   argues that Carlson misplaces a reliance on time punch data, citing a decision from this District

8   in which time punch data was found inadequate. See Brady v. AutoZone Stores, Inc., No. C13-

9   1862 RAJ, 2018 WL 3526724, at *3-4 (W.D. Wash. July 23, 2018). But in Brady the court

10   denied certification because the plaintiff only provided time punch records and found no

11   evidence of a common policies or practices. Id. That stands in stark contrast to the record before

12   the Court here, which shows both compelling time punch data and policies and practices that

13   impede the class members' ability to take timely and full rest breaks. As acknowledged in Brady,

14   time punch data can be sufficient to make a prima facie claim, particularly if coupled with other

15   evidence of the custom and practice preventing employees from taking breaks. Id. at *4. Second,

16   Home Depot relies on a case which rejected certification where the evidence concerning

17   defendant's customs and practices was inconsistent. See Berry v. Transdev Servs., Inc., No. C15-

18   01299-RAJ, 2019 WL 117997 (W.D. Wash. Jan. 7, 2019)). The Court finds no similar defect in

19   the declarations Carlson provides here.

20           **d.**    **Home Depot's Affirmative Defense to Meal Break Claims**

21        Home Depot argues that predominance cannot be satisfied because it is entitled to present

22   an affirmative defense of waiver, which requires individual inquiries of each class member

23   before resolving Home Depot's liability. The Court rejects this argument.

24

1    As the Ninth Circuit has acknowledged, "[d]efenses that must be litigated on an

2  individual basis can defeat class certification." True Health Chiropractic, Inc. v. McKesson

3  Corp., 896 F.3d 923, 931 (9th Cir. 2018). This follows the general rule that "a class cannot be

4  certified on the premise that [the defendant] will not be entitled to litigate its statutory defenses

5  to individual claims." Wal-Mart, 564 U.S. at 367 (internal citation omitted). Doing so would

6  violate the Rules Enabling Act, which "forbids interpreting Rule 23 to 'abridge, enlarge or

7  modify any substantive right.'" Id. (quoting 28 U.S.C. § 2072(b)). But "[w]hen one or more of

8  the central issues in the action are common to the class and can be said to predominate, the

9  action may be considered proper under Rule 23(b)(3) even though other important matters will

10  have to be tried separately, such as damages or some affirmative defenses peculiar to some

11  individual class members." Tyson Foods, 577 U.S. at 453 (citation and quotation omitted); see 2

12  Newberg on Class Actions § 4:55 (5th ed.) ("Courts traditionally have been reluctant to deny

13  class action status under Rule 23(b)(3) simply because affirmative defenses may be available

14  against individual members." Id. (citation omitted)).

15    When analyzing whether an affirmative defense must be litigated on an individual basis,

16  the Court must "assess predominance by analyzing the [affirmative] . . . defenses [the defendant]

17  has actually advanced and for which it has presented evidence." True Health, 896 F.3d at 931.

18  Under Washington law an employer may rebut a prima facie showing of missed or late meal

19  breaks "by showing that in fact no violation occurred or a valid waiver exists." Brady, 188

20  Wn.2d at 584. A waiver is the intentional and voluntary relinquishment of a known right. See

21  Jones v. Best, 134 Wn.2d 232, 241 (1998). "It may result from an express agreement or be

22  inferred from circumstances indicating an intent to waive" but "there must exist unequivocal acts

23

24

1   or conduct evidencing an intent to waive; waiver will not be inferred from doubtful or

2   ambiguous factors." Pellino, 164 Wn. App. at 697.

3         Home Depot falls short of identifying any evidence that can sustain its affirmative

4   defense of waiver. Because Home Depot does not have any system to track waived meals

5   (contrary to LNI's recommended best practices), it relies exclusively 21 of the 57 declarations it

6   filed from current employees. (Def. Mot. at 7 n.21; Def. Opp. to Pl. Mot. at 6 n.4.) Of these, only

7   5 employees claim to have missed lunches altogether and 17 others claim to have taken late

8   lunches on rare occasions. There are several problems with these declarations. First, for those

9   who have taken late meals, they claim to have done so because they were helping customers or

10  were too busy, not because they freely chose to do so. (See Albert Decl. ¶ 8; Bachofer Decl. ¶ 6;

11  Buhr Decl. ¶ 6; Clayton Decl. ¶¶ 6-7; Clementson Decl. ¶ 8; Conway Decl. ¶ 6; Crawford Decl. ¶

12  7; Dominguez Decl. ¶ 7; Driscoll Decl. ¶¶ 7, 10; Goodman Decl. ¶ 7; Kirkham Decl. ¶¶ 9, 11;

13  Loomis Decl. ¶ 7; Moss Decl. ¶ 9; Ogas Decl. ¶ 9; Thompson Decl. ¶ 9; Zinkgraf Decl. ¶ 6.)[1]

14  This undermines the voluntary aspect of the waiver. See Jones, 134 Wn.2d at 241. And for those

15  who claim to have missed lunches, they fail to say when the missed lunches happened or that

16  their decision was truly voluntary. (See Baker Decl. ¶ 7 (missed due to inattention); Clementson

17  Decl. ¶ 8 (handful of missed lunches when she is too busy); Conway Decl. ¶ 6 (missed one lunch

18  when too busy); Cosgrove Decl. ¶ 6 (missed lunch once 26 years ago); Thompson Decl. ¶ 9

19  (occasionally misses lunch to help customers).) These statements are ambiguous and equivocate

20  on the key question of whether the purported waivers were truly voluntary.

21

22

23  [1] One declarant claims not to have missed or delayed any meals (Ogas Decl.), while one other
    says nothing about having waived any breaks (Dietrick Decl.).

24

Second, the Court cannot overlook the declarants' unreliability and bias given that they are current employees who might fear retaliation if they cast their employer in a bad light. See Morden v. T-Mobile USA, Inc., No. C05-2112RSM, 2006 WL 2620320, at *3 (W.D. Wash. Sept. 12, 2006) (discounting declarations of 99 current employees). The concern about bias and reliability is not theoretical. The time punch data shows that some of the statements these individuals make about not missing or taking late meals are likely untrue. Roughly half of the declarants who claim to have never missed meals or rarely take late meals have missed many first and second meals and routinely take late lunches. (See Second Declaration of Paul Torelli Ex. A; see also Pl. Opp. at 10 (noting other inconsistencies).) For example, Jacob Ogas declares that he does not miss meal breaks, and has maybe taken meal breaks late a couple of time a year because he was helping a customer. (Ogas Decl. ¶¶ 8-9.) But the time punch data show that he missed 22.8% (159) of first meal breaks and 38.9% of second meal breaks during the class period and that almost 5% of his meal breaks were late. (See Second Torelli Decl. Ex. A.)

Having considered all of the evidence Home Depot has put forward, the Court finds that it has not met its burden of showing credible evidence necessary sustain its affirmative defense of waiver or why the issue of waiver undermines Carlson's strong showing of commonality and predominance.

### e.    Rest Break Claims

Carlson has also satisfied predominance and commonality as to his missed rest break claims, which differ slightly from the meal break claims for two reasons.

First, Carlson has presented sufficient evidence that his rest break claim presents common issues that predominate and that can be resolved on a class-wide basis. Carlson cites to his own testimony and that of 19 other class members who consistently aver that they frequently missed or delayed rest breaks due to a lack of adequate staffing, their unique supervisory and

1    specialist roles, and their duty to remain with customers above all else. Home Depot's provides

2    nothing to contradict this evidence. Home Depot's cohort of declarants rarely say anything about

3    missing or delaying rest breaks and those that admit to taking late rest breaks blame their

4    customers-service duties. A fact-finder could find liability under the LNI regulations based on

5    this testimony about the general practices and the workplace "culture that encourages employees

6    to skip breaks." See Chavez, 190 Wn.2d at 518. While Carlson does not have data to demonstrate

7    the precise number of missed or late rest breaks, he can prove liability using the evidence he

8    relies on in seeking class certification. This satisfies predominance and commonality.

9        Home Depot has failed to identify any individualized issue that will destroy

10   predominance or commonality. Home Depot relies on Berry to argue that rest break claims

11   cannot be proven using anecdotal evidence. (See Def. Mot. at 20-21 (citing Berry, 2019 WL

12   117997, at *5); Def. Opp. to Pl. Mot. at 8 (citing same).) Even if Berry were binding authority, it

13   contains no such pronouncement. The decision in Berry was instead driven by the "unclear"

14   evidence of a common practice preventing rest breaks and the fact that not all of the potential

15   class members were subject to the same policies. Berry, 2019 WL 117997, at *5. Here there is no

16   variation in the applicable policies and the declarations Carlson provides paint a coherent picture

17   of missed or delayed rest breaks. And in Berry, the employees were allowed to track any missed

18   rest breaks and get paid. Id. at *3. That is not the case here where Home Depot offers no means

19   of tracking rest breaks at all. And because there is no waiver defense available to Home Depot

20   there are no individualized issues about whether timely and full rest breaks were waived. See

21   LNI Policy ES.C.6.1, "Meal and Rest Periods for Nonagricultural Workers Age 18 and Over," at

22   4 (rev. Dec. 1, 2017) (Berger Decl. Ex. 9).

23

24

1

2    **f.   Wage Rebate Claim**

Carlson has also satisfied predominance and commonality as to his Wage Rebate Act

3    claim. The primary question is whether Home Depot's withholding of wages is willful. See Hill,

4    191 Wn.2d at 561. As Carlson explained at oral argument, he intends to prove willfulness on a

5    class-wide basis using the same common evidence of Home Depot's policies, practices, and

6    customs and the time-punch data. The Court finds that this evidence can be used to resolve the

7    substance of Carlson's claim under the Wage Rebate Act as to both rest and meal breaks because

8    it could convince a fact-finder that Home Depot knew and tracked missed breaks and willfully

9    withheld those wages. Home Depot has not identified any reason why its defense to this claim

10   (that there is a "bona fide" dispute) would involve unique issues that would ruin commonality or

11   predominance. The Court finds Carlson has satisfied predominance and commonality as to this

12   claim.

13   **g.   CPA**

14   Carlson fails to persuade the Court that his CPA claim can be resolved on a class-wide

15   basis.

16   Carlson argues that his CPA claim is simply that "Home Depot engaged in a deceptive

17   and unfair practice by compelling its employees to submit manipulated time records showing

18   compliant meal periods in order to avoid discipline for missing or taking late meal breaks." (Pl.

19   Opp. to Def Mot. at 17.) In support of this argument, Carlson cites to his own testimony and that

20   of five other class members. The Court finds that this evidence is not sufficient to show that

21   alteration of time records occurred on a class-wide basis. The class members' declarations

22   suggest that some employees have felt or been pressured to manipulating time records. (See

23   Christian Decl. ¶ 8 (manager told her to alter her time records); Cronin Decl. ¶ 4 (manager

24   clocked her out); Martin Decl. ¶ 4 (altered time punches to avoid violating the meal break rules);

1  Mccarty Decl. ¶ 7 (pressured to clock out but does not state he misreported meal breaks);

2  Reynolds Decl. ¶ 4 (altered time records to hide missed lunches to avoid getting in trouble).) But

3  these six people out of a class of nearly 2,500 do not convince the Court that this practice is

4  common to the class, particularly since there is no time punch or other data to confirm such

5  alterations were common. And as Home Depot argues, there can be many reasons why time slip

6  changes are submitted and any determination of whether those edits were coerced would require

7  individualized determinations. Home Depot itself also provides its cohort of declarants who

8  dispute the claim of having their time records altered. Given the evidence presented, the Court

9  finds that certification of the CPA claim is improper. But this does not impede certification of the

10  class as to the remaining claims.

11  **2.    Superiority**

12      "In determining superiority, courts must consider the four factors of Rule 23(b)(3)."

13  Zinser v. Accufix Rsch. Inst., Inc., 253 F.3d 1180, 1190 (9th Cir.), as amended on denial of

14  reh'g, 273 F.3d 1266 (9th Cir. 2001). The four factors are:

15      (A) the class members' interests in individually controlling the prosecution or defense of
        separate actions;
16      (B) the extent and nature of any litigation concerning the controversy already begun by or
        against class members;
17      (C) the desirability or undesirability of concentrating the litigation of the claims in the
        particular forum; and
18      (D) the likely difficulties in managing a class action.

19  Fed. R. Civ. P. 23(b)(3)(A)-(D).

20      Carlson has shown sufficient superiority to satisfy Rule 23(b)(3). First, the case involves

21  relatively small claims for missed wages where the amount potentially to be recovered is far

22  outweighed by the costs of individual litigation against a large corporation such as Home Depot.

23  As the Ninth Circuit has explained, "[w]here damages suffered by each putative class member

24

are not large, this factor weighs in favor of certifying a class action." <u>Zinser</u>, 253 F.3d at 1190;

<u>see</u> Fed. R. Civ. P. 23(b)(3)(A). Second, neither party has identified any other cases involving

these kinds of claims against Home Depot. <u>See</u> Fed. R. Civ. P. 23(b)(3)(B). Third, there is good

reason to focus the claims in this forum because it applies Washington law to Washington

residents who have encountered Home Depot's common practice of allegedly depriving

employees of timely and full meal and rest breaks. <u>See</u> Fed. R. Civ. P. 23(b)(3)(C). Fourth, there

are no obvious difficulties in managing this on a class basis. <u>See</u> Fed. R. Civ. P. 23(b)(3)(D). The

Court finds superiority easily met on this record.

### 3. Numerosity, Typicality, and Adequacy

Though Home Depot does not challenge numerosity, typicality, or adequacy, the Court

independently confirms that each element is satisfied.

First, as to numerosity, Carlson has identified 2,478 putative class members. This

satisfies Rule 23(a)(1) because joinder of this many plaintiffs would be impractical. <u>See</u> Fed. R.

Civ. P. 23(a)(1); <u>Gen. Tel. Co. of the Nw. v. Equal Emp. Opportunity Comm'n</u>, 446 U.S. 318,

330 (1980) ("The numerosity requirement requires examination of the specific facts of each case

and imposes no absolute limitations.").

Second, Carlson has demonstrated that his claims are typical of the class. <u>See</u> Fed. R.

Civ. P. 23(a)(3). "The test of typicality 'is whether other members have the same or similar

injury, whether the action is based on conduct which is not unique to the named plaintiffs, and

whether other class members have been injured by the same course of conduct.'" <u>Hanon v.</u>

<u>Dataproducts Corp.</u>, 976 F.2d 497, 508 (9th Cir. 1992) (citation omitted). Carlson has shown that

his claims are typical of the class and result from the same alleged course of conduct, policies,

and practices.

1    Third, Carlson and his counsel have shown that they are adequate representatives of and

2  for the class. "The final hurdle interposed by Rule 23(a) is that 'the representative parties will

3  fairly and adequately protect the interests of the class.'" Hanlon v. Chrysler Corp., 150 F.3d

4  1011, 1020 (9th Cir. 1998) (quoting Fed. R. Civ. P. 23(a)(4)), overruled on other grounds by

5  Wal-Mart, 564 U.S. 338. Adequacy of representation requires that "[f]irst, the named

6  representatives must appear able to prosecute the action vigorously through qualified counsel,

7  and second, the representatives must not have antagonistic or conflicting interests with the

8  unnamed members of the class." Lerwill v. Inflight Motion Pictures, Inc., 582 F.2d 507, 512 (9th

9  Cir. 1978). As to class counsel, the Court must also assess the following requirements of Rule

10  23(g):

11        (i) the work counsel has done in identifying or investigating potential claims in the
         action;
12
         (ii) counsel's experience in handling class actions, other complex litigation, and the types
13       of claims asserted in the action;

14       (iii) counsel's knowledge of the applicable law; and

15       (iv) the resources that counsel will commit to representing the class.

16  Fed. R. Civ. P. 23(g)(1)(A). The Court may also consider "any other matter pertinent to

17  counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P.

18  23(g)(1)(B). And class counsel must "fairly and adequately represent the interests of the class."

19  Fed. R. Civ. P. 23(g)(4).

20        The Court is satisfied that Carlson will prosecute this action on behalf of the class, as he

21  has already demonstrated by sitting for a deposition and providing counsel with his records. And

22  the Court is unaware of any conflict of interest between Carlson and any class members. The

23  Court is also satisfied that Adam Berger and Elizabeth Hanley and their firm, Schroeter

24

1  Goldmark & Bender, will fairly and adequately represent the interests of the class. The attorneys

2  and firm have demonstrated the necessary knowledge and ability to litigate the claims in this

3  matter, their experience handling similarly complex matters, and their ability and desire to

4  devote the necessary resources to representing the class.

5  **CONCLUSION**

6       The Court finds that Carlson has satisfied the elements of Fed. R. Civ. P. 23(a) and

7  23(b)(3). The Court therefore GRANTS Carlson's Motion in part and DENIES Home Depot's

8  Motion in part, certifying all but the CPA claim for class treatment as to the following class: All

9  individuals employed by Home Depot as in-store supervisors or specialists in Washington State

10  at any time between June 26, 2017 and the date of this Order. Carlson may pursue his CPA

11  claim, but only on an individual basis.

12       The clerk is ordered to provide copies of this order to all counsel.

13       Dated October 7, 2021.

14

15       Marsha J. Pechman
     United States Senior District Judge

16

17

18

19

20

21

22

23

24